Filed 6/16/15  Rawlings v. City of Albany CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEFANIE RAWLINGS, | |
| Plaintiff and Appellant, | |
| v. | |
| CITY OF ALBANY, | A139725 |
| Defendant; | |
| | (Alameda County |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | Super. Ct. No. RG12644349) |
| Real Party in Interest and Respondent; | |
| ULAN MACKNIGHT, | |
| Movant and Appellant. | |

**I.  INTRODUCTION**

This case concerns a University of California project located in Albany, California.  After the City of Albany approved an Environmental Impact Report (EIR) prepared for this project pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] appellants Stefanie Rawlings and Ulan MacKnight (collectively referred to as "Rawlings") sought a writ of mandate to set aside

---

[1]All further statutory references are to the Public Resources Code unless otherwise indicated.

the approval. The trial court denied this petition.  On appeal, Rawlings argues that the EIR violates CEQA for two reasons, both having to do with the EIR's alternatives analysis:  first, she contends the EIR does not set out an appropriate range of feasible alternatives and, second, she argues the City's infeasibility finding with respect to one of the alternatives is not supported by substantial evidence.

We disagree and affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

**A.**     *University Village Mixed-Use Project*

University Village[2] is a 77-acre piece of land on San Pablo Avenue, in Albany California.  Originally a family home and nursery, the property was acquired by the University of California (the "University") in the 1920s.  During World War II, temporary housing was built on the site for military personnel.  After the war, this housing reverted to the University and was used as student housing. In the early 1960s, additional housing was constructed.

Between 1997 and 2003, the University drew up a Master Plan to redevelop University Village.  In Step 1, the University planned to (and has) replaced most of the student housing that had been built in the 1940s and 1960s.  Step 2 anticipated the replacement of the rest of the housing on the site.  Step 3, which this appeal involves, called for "a joint venture development of 26 acres of land adjacent to San Pablo Avenue for mixed uses" (the "Project").

The scope of the University's intended development is more specifically described in the EIR prepared after the University sought the approval of the City of Albany (the "City") for the Project.[3]  The EIR describes the Project as follows:  (1) "Locate a mixed-

---

[2] University Village is truly a village:  it has "an administration building, maintenance shops and grounds, police station, swap shop, activity rooms, cafe, community center, child care center, laundry and two study trailers. There are two parks . . . , a community garden, two Little League playing fields, a new soccer field and temporary softball field, a children's playground, and an all-purpose recreation court."

[3] The University is not required to comply with local land use regulations when it undertakes development projects that support its educational mission.  However, where,

2

use project on the San Pablo Avenue corridor within Block B[4] of the project site"; (2) "Build a grocery store within the San Pablo Avenue frontage of University Village located within Block A of the project site"; (3) "Offer retail space and outdoor seating as a local amenity designed to connect with the surroundings and serve local residents and new residents of the project"; (4) "Facilitate pedestrian/bicycle movement across San Pablo Avenue"; (4) "Improve the visual quality of the site"; (5) "Provide senior housing"; (6) "Within the project site, provide a pedestrian/bicycle path along Codornices Creek."

At the time the project was proposed, the site was zoned for three different uses: "San Pablo Avenue Commercial (SPC), Residential Medium Density (R-2), and Watercourse Overlay District." The "San Pablo Commercial" designation applied to land within 100 feet of San Pablo Avenue. Under the San Pablo Commercial designation, both commercial and residential uses were permitted, the maximum residential density allowed was 63 units per acre and the maximum building height was three stories. The second zoning designation, "Residential Medium Density," did not allow commercial uses, with the exception of parking for adjacent commercial uses, and permitted a maximum residential density of 35 dwelling units per acre.

In order to proceed with the Project as proposed, the Regents would need, and therefore applied for, a zoning change to designate the entire property as "San Pablo Commercial." The University also sought a "Planned Unit Development approval to allow for an increase in height as well a parking exception to reduce the required parking

as is the case with the project involved in Step 3 of the University's Master Plan, a project is outside this mission, the University must seek local approval. Consistent with this policy, a key objective of the Project, according to the University, "is the creation of a site plan and building design that is sensitive to City of Albany land use plans and policies and meets the development goals and design policies of The Regents of the University of California."

[4] The Project site is divided into two pieces of property that the parties refer to as Block A and Block B. Block A is 2.8 acres and is located northwest of the San Pablo Avenue/Monroe Street intersection). Block B is about 2.5 acres and is southwest of the San Pablo Avenue/Monroe Street intersection.

spaces." These, and other requested City actions[5] triggered an obligation on the part of the City to determine whether the Project would have a significant environmental impact and, if so, to prepare an EIR. Concluding that the Project would have such an impact, the City proceeded to prepare an EIR, which is the subject of this appeal.

## C.    *Environmental Impact Report*

Because the issues in this case have to do only with the adequacy of the alternatives identified in the EIR and the City's rejection of these alternatives, we limit our discussion of the EIR to those subjects.

The EIR identifies three alternatives to the Project: (1) "**The No Project Alternative**, which assumes the continuation of existing conditions within the project site"; (2) "**The Existing Zoning Alternative**, which envisions a level and type of development that would comply with the existing zoning designations on the project site"; and (3) "**The Reduced Residential Alternative**, which would include 85 senior housing units and the same grocery and retail component as the proposed project."

The Existing Zoning Alternative scaled the Project back from the proposed 55,000 square foot grocery store to a 15,000 square foot market located within Block A, which fronted on San Pablo Avenue and was, therefore, already designated San Pablo Avenue Commercial. Because the San Pablo Commercial zoning designation required a building setback, the Block B component of the Existing Zoning Alternative comprised two buildings rather than the single building the Project envisioned. Under the Existing Zoning Alternative, a mixed-use building would front on San Pablo Avenue, and include 16,000 square feet of retail on the ground floor with senior housing units on the second floor. This structure would be approximately 30 feet tall. The second structure on Block B would be three stories tall and contain the remaining senior housing. "Combined, the buildings would include 70 senior housing dwelling units."

---

[5] The Regents also sought, and the City ultimately approved, a density bonus for senior housing and a Development Agreement for the Project, as modified in the course of the EIR process.

4

The Reduced Residential Alternative retained Block A from the proposed Project (including 2,000 square feet of retail uses and a 55,000 square foot Whole Foods Market as well as a parking lot). Block B, however, would include only 85 residential units, which was 90 units fewer than the Project. Block B's retail component was envisioned to be identical to that of the Project.

The Project was larger in scope than either of these two alternatives. The biggest contrast was between the Project and the Existing Zoning Alternative. The Project envisioned a grocery store on Block A that was 55,000 square feet rather than the 15,000 square feet proposed under the Existing Zoning alternative. In addition, the Project's senior housing was included in a single building that contained 175 units of senior housing above a 28,000 square foot retail space. The Existing Zoning Alternative provided for two smaller buildings on Block B. Both buildings contained senior housing, and one of the two buildings had 16,000 square feet of retail on the ground floor. The two buildings would only include 70 senior housing units. The Reduced Residential Alternative was far more similar to the Project. There, the only material difference was that the former provided only 85 units of senior housing as opposed to 175 units.

**D.** *Project Approval*

The City circulated a Draft EIR in July 2009. An extended comment period, fourteen public hearings before the Planning Commission and six hearings before the City Council ensued.

In July 2012, the City certified the EIR and approved the Project. In so doing, the City rejected as infeasible the three alternatives described in the EIR. The City found that these alternatives "fail to achieve the comprehensive goals and objectives of the General Plan for Albany, and as such are deemed infeasible."[6] The City also observed that

---

[6]The General Plan objectives the City found the Project would fulfill included "upgrading commercial development along San Pablo Avenue in order to expand the City's economic base"; providing "mixed use development along the San Pablo Avenue Commercial Corridor"; and "expand[ing] housing opportunities for the elderly, disabled, and other persons with special housing needs." The Project's 175 new housing units

5

"[w]hile the Alternative Land Uses would reduce some impacts to a level of insignificance, they would not result in the same economic and social benefits as proposed by the project." The City also found that "[t]he economic benefits to the City [of the Project] in terms of potential increased tax revenues, broadened employment opportunities, and aesthetic improvement to the currently vacant site outweigh the adverse environmental consequences . . . ."

E.    *Appeal*

Rawlings filed a petition for writ of mandate in August 2012. In its order denying this petition, the trial court summarized Rawling's arguments as follows: (1) the City did not properly define the Project and therefore avoided considering the implications of the Project on another part of the Gill Tract that contained a University-run experimental farm; (2) the City failed to consider that the Project would significantly impact agricultural resources; (3) the City did not consider a reasonable range of alternatives in its alternatives analysis; (4) the City failed to respond adequately to comments to the EIR; and (5) the City should have, but did not, adopt the Existing Zoning Alternative or explain why it chose not to do so. The trial court denied this petition in June 2013 and this timely appeal, which challenges only the EIR's alternatives analysis, followed.

### III.  DISCUSSION

A.    *Standard of Review*

Our review of the denial of a writ of mandate to set aside a public agency's decision on the ground of noncompliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; *In re Bay–Delta etc.* (2008) 43 Cal.4th 1143, 1161 (*In re Bay-Delta*).) We review " 'the agency's action, not the trial court's

---

would also "make progress towards Albany's Fair Share of Alameda's Regional Housing Needs Allocation as identified by ABAG for 2007-2014."

decision; in that sense appellate judicial review under CEQA is de novo.' " (*In re Bay-Delta*, *supra*, at p. 1162.)

We also "presume that the agency's decisions are correct, and the challenger bears the burden of proving to the contrary." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 11.)  " ' "The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' " (*In re Bay–Delta*, *supra*, 43 Cal.4th at p. 1161.)

In the CEQA context, "[t]he substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)  Further, " '[s]ubstantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." '  [Citations.] . . . 'Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Ibid.*)  " 'In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and decision.  [Citation.]  [¶]  In applying that standard, rather than the less deferential independent judgment test, "the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." ' " (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1177.)" (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596 (*Town of Woodside*).)

**B.**     *Alternatives Analysis*

Rawlings makes two arguments regarding the alternatives identified in the EIR. First, she contends that these chosen alternatives were essentially shams, that is, they were "designed to be rejected" and thus failed to fulfill CEQA's requirement that an EIR

7

describe a reasonable range of alternatives. She also argues that substantial evidence does not support the City's rejection of these alternatives. She is incorrect on both counts.

### 1. *Selection of Alternatives*

CEQA provides that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) In fact, " '[o]ur Supreme Court has described the alternatives and mitigation sections as 'the core' of an EIR.' " (*Town of Woodside*, *supra*, 147 Cal.App.4th at p. 597.)

"The lead agency is responsible for selecting a range of potential alternatives for examination and must publicly disclose its reasoning for selecting those alternatives." (Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines) §§ 15126.6, subd. (a), 15126.6, subd. (c); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 569 (*Goleta*).) "There is no iron clad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines § 15126.6, subd. (a).) The "rule of reason" requires an EIR "to set forth only those alternatives necessary to permit a reasoned choice." (*Id.* §§ 15126.6, subd. (f), 15126.6, subd. (a); *Goleta, supra*, 52 Cal.3d at 566 ["CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose"]; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 999 (*California Native Plant Society*).)

At this preliminary stage, a "feasible" alternative is one that could accomplish "most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects." (Guidelines § 15126.6, subd. (a).) We will uphold an agency's choice of alternatives unless they "are manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v.*

*City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265 (*Federation of Hillside & Canyon Associations* ).)

Here, the EIR identified three alternatives. The first, as required by the Guidelines, was a "no project" alternative. (Guidelines, § 15126.6, subd. (e).) The other two alternatives involved some development of the San Pablo Avenue site, but not to the extent proposed by the University. As scaled-down versions of the University's development proposal, these alternatives could reasonably be expected to "avoid or substantially lessen" some of the Project's "more significant effects." In addition, they accomplished one of the University's most basic objectives, namely the development of a mixed-use project on the San Pablo Avenue corridor that included a grocery store and retail space, as well as senior housing. We conclude, therefore, that this range of project alternatives analyzed in the EIR was well within the "rule of reason." (*Federation of Hillside & Canyon Associations*, *supra*, 83 Cal.App.4th at p. 1265.)

Citing *Watsonville Pilots Association v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1089 (*Watsonville Pilots*), Rawlings argues that the City's choice of alternatives was flawed because the alternatives were "written to be . . . rejected." In other words, she argues that because the alternatives were ultimately found to be infeasible, they were not "true" alternatives.

An agency cannot frame alternatives so as to "meet few if any of the project's objectives so that these alleged alternatives may be readily eliminated." (*Watsonville Pilots*, *supra*, 183 Cal. App. 4th at p. 1089.) That is not the case here, however. As we have noted, the two alternatives other than the required "no project" alternative met the significant project objective of developing the site to include a grocery store, retail space and senior housing. The City's infeasibility finding was not, as Rawlings suggests, based on the fact that the alternatives were not identical to the Project itself and thus could never be found to meet the Project's goals. Rather, they were found infeasible because, among other things, they did not fulfill the City's policy goals for the San Pablo corridor as well as the Project itself did. As the *Watsonville Pilots* court explained "[i]t is virtually a given that the alternatives to a project will not attain *all* of the project's

9

objectives. [Citations.] Nevertheless, an EIR is required to consider those alternatives that will 'attain most of the basic objectives' while avoiding or substantially reducing the environmental impacts of the project. (CEQA Guidelines, § 15126.6(a).)" (*Id.* at p. 1087.) What is required here "is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned." (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910.)

Rawlings also contends that the third alternative (which provided for the same size market and retail space as that proposed in the Project but reduced the number of housing units) was flawed because although it was feasible and would meet the Project's objectives, it only " 'minimally reduce[d] the significant environmental impacts.' " We disagree.

The Guidelines provide that "[t]he range of potential alternatives to the proposed project shall include those that could feasibly accomplish most of the basic objectives of the project and could avoid or substantially lessen one or more of the significant effects." (Guidelines, § 15126.6, subd. (c).) Although the Existing Zoning alternative would have more significantly reduced the environmental impact of the project than the Reduced Residential Alternative, the EIR's inclusion of a less-effective reduced project alternative was not improper. As we observed in *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco*, *supra*, 106 Cal.App.3d at p. 910, "[a]bsolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply." Here, the City made such an effort and put forward three project alternatives that adequately "represent enough of a variation to allow informed decisionmaking." (*Mann v. Cmty. Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1151) Accordingly, we agree with the trial court that the City's selection of these alternatives fulfilled the informational goals of CEQA and was not an abuse of discretion.

10

## 2.     *Rejection of Existing Zoning Alternative*

Rawlings also argues that substantial evidence does not support the City's finding that the Existing Zoning Alternative was infeasible.  We disagree.[7]

Most basically, before a public agency may approve a project for which an EIR identifies a significant environmental impact, the agency must make a finding that "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR]."  (§ 21081, subd. (a)(3).)  Such a finding must be based on "substantial evidence in the record." (§ 21081.5.)  "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."  (§ 21080, subd. (e)(1).)  According to the Guidelines, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Guidelines, § 15384, subd. (a).)  In reviewing the record for substantial evidence, we presume the agency's findings are correct and resolve all conflicts and reasonable doubts in favor of the findings.  (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 881-882; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 997.)

The City's conclusion that the Existing Zoning Alternative was infeasible was based primarily on its land use planning goals for the San Pablo Avenue corridor.  A number of documents in the record articulate those goals.  In 1989, the City completed a "San Pablo Avenue Urban Design Plan" and in 1993 adopted "San Pablo Avenue Design Guidelines."  In 1997, the City commissioned a study designed to assist it in taking regulatory steps to implement and clarify its design guidelines for San Pablo Avenue.

---

[7] We note that the trial court also found that the City's infeasibility determination regarding the Existing Zoning Alternative was supported by substantial evidence.  The City's infeasibility finding, according to the trial court, was based on "primarily non-quantitative social and economic reasons, such as a desire for 'significantly [more] retail and grocery space,' and 'promot[ing] the goals of the General Plan, including upgrading commercial development on San Pablo Avenue.' "

11

The final document, which was drafted in consultation with City staff and the City Council is referred to as the "San Pablo Avenue Vision Plan."

This document describes San Pablo Avenue as a street that is "heavily traveled and contains four traffic lanes, two parallel parking lanes, and one continuous central left-turn lane. It is a very wide street lined with small buildings, parking lots, and deciduous trees that are small relative to the street's width." San Pablo Avenue was "a largely undifferentiated strip with few landmarks and very little to distinguish individual blocks from each other. Even at the main intersection with Solano Avenue, there is no indication that one is passing one of the most important retail streets in Albany." Moreover, "San Pablo Avenue's economic condition is closely tied to its physical characteristics [and] a land use pattern that pre-dates freeways, when San Pablo Avenue was the East Bay's main north-south highway. Buildings along San Pablo Avenue were designed to attract pass-by traffic from among the many motorists on the street. At the same time however, lots along the street are both narrow and shallow, which reflects the early time during which subdivision occurred. These small lots preclude the attraction of modern automobile-oriented retail facilities that would correspond to the high volumes of traffic on San Pablo Avenue."

The City's express intent for San Pablo Avenue was to make the "corridor both more visually pleasing and economically vital." The Vision Plan noted that "San Pablo Avenue has the potential to accommodate new retail and housing developments, particularly if the identified physical impediments are overcome. The market area surrounding the corridor has the population base to warrant new retail stores, and the region also has a strong demand for housing."

The City's "vision" for this corridor was to "allow the street to continue to function as a major arterial, while also creating nodes of pedestrian and retail interest along it. San Pablo Avenue should become a unique, recognizable place that residents of Albany and the larger region know about and want to visit. It should be the site of high-quality retail, office and high-density residential development . . . ."

The City anticipated that "[b]oth public and private improvements, as well as changes to City regulations, will be necessary to realize this vision. [¶] Private improvements will include new, larger buildings along San Pablo Avenue. In order to take advantage of the opportunities afforded by the high traffic volumes on the street, new buildings on San Pablo Avenue should be a minimum of two stories tall; three stories is preferred. These new buildings should be built to a consistent 'build-to' line along the street, to create a sense of enclosure for the street, and they should be designed with details that are attractive to both motorists and pedestrians. Mixed-use projects with retail on the ground floor and offices or apartments above are particularly appropriate; buildings that contain only offices or apartments are acceptable in some location[s] where ground-floor retail uses are not viable." Because existing land use regulations did not consistently permit such development, the City anticipated the "need to make a number of changes to its development regulations to implement these changes. Changes will be needed in the General Plan, the Zoning Code, the San Pablo Avenue Design Guidelines and the City's parking and signage regulations." The City expressed similar goals in its 1993 San Pablo Avenue design guidelines, its 1998 Master Plan as well as its 2004 Subsequent focused EIR, and its July 2009 Initial Study/Environmental Checklist for the Master Plan.

An infeasibility finding may be, and often is, based on "[b]roader considerations of policy." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 948, citing *California Native Plant Society*, *supra,* 177 Cal.App.4th at p. 1000; see also *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417 [City "reasonably rejected . . . project alternatives . . . infeasible in view of the social and economic realities in the region"].) Here, the Project was more closely aligned with the City's policies for the San Pablo Avenue corridor than the Existing Zoning Alternative because it brought to the area the greater visual and retail presence the City desired. The Existing Zoning Alternative, in contrast, did not fulfill these policies and the City did not violate CEQA in rejecting it.

13

Rawlings's principal argument to the contrary is that the City's rejection of the Existing Zoning alternative was a financial decision and not adequately supported by substantial evidence in the record.[8] She is correct that the City also found the Existing Zoning Alternative infeasible because it "would not provide the same level of economic benefits to the City in terms of potential increased tax revenues and broadened employment opportunities." Although the EIR contains an estimate of revenue the Project was projected to generate for the City, it did not calculate or compare this number with the revenue the Existing Zoning Alternative might generate.

It is well established that when alternatives are found infeasible on financial grounds, the record must contain evidence of a comparison between the alternatives and the project. (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1462 [County required to consider "comparative costs or profitability" of project and alternative]; *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1355-1356, 1357 [infeasibility finding erroneous where record contained no evidence of profitability and tax revenue generated by reduced-size alternative]; *Goleta, supra*, 197 Cal.App.3d at p. 1181 [insufficient numerical information to support conclusion that alternative was impractical because of "additional costs or lost profitability"].)

Were the City to have found the Existing Zoning Alternative infeasible on this ground alone, its decision would have been in error. However, the City's grounds were not so limited. As we have explained, the City's infeasibility finding was based on a policy decision that the Existing Zoning Alternative was inferior to the Project because it

_____

[8] The trial court found that "[t]he record is . . . devoid of facts or analysis regarding what revenues or jobs any alternative would generate. The City did not provide any facts that support a comparative analysis between the alternatives. [Citation.] The court could speculate that a 55,000 sft grocery store would generate more sales tax revenue and employ more people than a 15,000 sft grocery store, but that speculation would be no substitute for CEQA's mandated disclosure of the City's analytic route from evidence to action. There is no substantial evidence to support the City's decision that the Existing Zoning Alternative was infeasible because the Project would provide more tax revenue to the City or generate more jobs in the City."

14

"fail[ed] to achieve the comprehensive goals and objectives of the General Plan for Albany."  Specifically, the City found the Existing Zoning Alternative provided "significantly less retail and grocery" space than the Project and that it "would not provide, or would provide to a lesser extent" the "numerous economic, social, environmental and other benefits to the City of Albany" than "[t]he programs and activities of the mixed use development at University Village provide."  The Project "better promotes the goals of the General Plan, including  upgrading commercial development along San Pablo Avenue in order to expand the City's economic base."  The City also noted that the Existing Zoning Alternative would provide "fewer dwelling units" than the Project, which meant it was inferior to the Project in meeting the City's goal of increased senior housing.  The City's determination that the Existing Zoning Alternative was infeasible based on its inferiority in achieving the City's policy goals is both supported by substantial evidence and permissible under CEQA.  (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 1001.)  As in that case, "[t]his is not a case involving straightforward questions of legal or economic infeasibility" and plaintiff's argument is "nothing more than a 'policy disagreement with the City.' "  (*Id.*)

## IV.  DISPOSITION

The trial court's order denying the petition for writ of mandate is affirmed.

15

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.