Filed 7/19/19

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CITY OF HESPERIA, | D075100 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CIVDS1602017) |
| LAKE ARROWHEAD COMMUNITY SERVICES DISTRICT ET AL., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Donald R. Alvarez, Judge. Affirmed.

Best Best & Krieger, Howard B. Golds and Lindsay D. Puckett for Defendants and Appellants.

Aleshire & Wynder, Eric L. Dunn, June S. Ailin and Nicholas P. Dwyer for Plaintiff and Respondent.

Over the years since at least 1959, the Legislature has attempted to achieve a balance between the state's interest in allowing local agencies to produce, generate, store, and transmit water or electrical energy and the cites' and counties' control over local building and zoning. This appeal requires the court to consider whether a solar energy

project proposed by a local agency, the Lake Arrowhead Community Services District (District), is exempt from—or whether the District must comply with—the zoning ordinances of the city in which the project is to be developed, the City of Hesperia (City).

Our analysis begins with the statutory requirement that, for purposes of a proposed solar energy project, a local agency must comply with the zoning ordinances of the city and county in which the project's facilities are to be constructed or located. (Gov. Code, § 53091, subd. (a); further undesignated statutory references are to the Government Code.) Then, as potentially applicable here, section 53091, subdivision (e) (§ 53091(e)), and section 53096, subdivision (a) (§ 53096(a)), each provides the agency with an exemption for the location and construction of certain types of facilities. Section 53091(e) provides an *absolute exemption* for "the location or construction of facilities . . . for the production or generation of electrical energy"—unless the facilities are "for the storage or transmission of electrical energy," in which event the zoning ordinances apply. Section 53096(a) provides a *qualified exemption* for an agency's proposed use upon, first, a showing that the development is for facilities "related to storage or transmission of water or electrical energy" and, second, a resolution by four-fifths of the agency's members that "there is no feasible alternative to [the agency's] proposal."

In the present case, the District adopted a resolution that its proposed solar energy project was both (1) absolutely exempt from the City's zoning ordinances under section 53091(e) and (2) qualifiedly exempt under section 53096(a), following the requisite determination that there was no feasible alternative to the proposed location of

2

the project. The City successfully challenged the resolution in the underlying superior court proceedings, where the court issued a judgment in favor of the City and a related writ of mandate directing that the District and its board comply with the City's zoning ordinance prior to implementing the project.

We affirm. As we explain, because the District's proposed project includes the transmission of electrical energy, the exemption contained in section 53091(e) does not apply to the project; and because the administrative record does not contain substantial evidence to support the District's board's finding that there is no feasible alternative to the proposed location of the project, the District prejudicially abused its discretion in determining that the exemption contained in section 53096(a) applied to the project.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

The dispute in this matter is between the District, which is attempting to develop a solar energy project on property it owns within the City's limits, and the City, which is attempting to enforce its zoning regulations.

A.     *Introduction*

The District is a community services district, established in 1978 pursuant to section 61000 et seq. Although community services districts may be authorized to

---

[1]     We have disregarded factual statements in the parties' briefs that are not accompanied by accurate references to either the administrative record or the superior court record. (Cal. Rules of Court, rule 8.204(a)(1)(C); (*Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 ["appellate courts may ' "disregard any factual contention not supported by a proper citation to the record" ' "]; *County of Riverside v. Workers' Comp. Appeals Bd.* (2017) 10 Cal.App.5th 119, 124 [courts " 'ignore' " factual statements in appellate briefs that do not contain record references].)

provide various governmental services (e.g., water, trash, street lighting, fire protection, parks and recreation, etc. (§ 61100)), the District is authorized only to provide water and wastewater treatment services within its boundaries, which are sometimes referred to as the Lake Arrowhead community.[2] A September 2014 report from the United States Department of the Interior indicates that the District served approximately 8,000 water customers and 10,500 wastewater customers in the Lake Arrowhead community.

The District owns and uses portions of a 350-acre area known as Hesperia Farms to discharge and percolate treated effluent from its water reclamation facilities in Lake Arrowhead into the Mojave River groundwater basin. The proposed solar energy project, which we describe in more detail at part I.B., *post*, is to be located on Arrowhead Lake Road in the far eastern portion of the City (Project Site), which consists of five to six acres of Hesperia Farms not being used for wastewater operations.

At all times, the Project Site has been located within an area the City has zoned as "Rural Residential" and has designated as "Rural Residential 0-0.4 units per acre" under the City's general plan. Section 16.16.063 of the City's Municipal Code (HMC) deals generally with alternative energy technology standards, and subsection (B) deals

---

[2] In a 2010 report, the District described its boundaries as follows: "[The District] is located in the Lake Arrowhead Community which includes the areas commonly known as Lake Arrowhead, Cedar Glen, Grass Valley, Twin Peaks, Crest Park, Rim Forest, Skyforest, Deer Lodge Park, and Blue Jay. The District's boundary and sphere of influence are currently coterminous and encompasses approximately 13 square miles generally bordered by a combination of section lines, parcel lines, and the Crestline Village Water District sphere on the west; a combination of section lines and parcel lines on the north and east; and parcel lines (north and south of State Route 18) on the south."

expressly with "solar farms";[3] and the parties agree that the District's proposed project qualifies as a solar farm for purposes of this ordinance.  HMC section 16.16.063(B) provides in relevant part:  "Solar farms shall only be allowed on nonresidential and nonagricultural designated properties with approval of a conditional use permit by the planning commission.  Solar farms shall not be permitted within six hundred sixty (660) feet of a railway spur, any interstate, highway, or major arterial, arterial, or secondary arterial roadway; or any agricultural or residentially designated property." (<https://library.municode.com/ca/hesperia/codes/code_of_ordinances/237774?nodeId=T IT16DECO_CH16.16LAUSDE_ARTIIIADUS_16.16.063ALENTEST> [as of July 19, 2019].)

B.      *The District's Hesperia Farms Solar Photovoltaic Project & the City's Objections*

In January 2014, the District received an analysis from an outside engineering consultant regarding the potential development of solar power at its Hesperia Farms site (the Solar Project).  In June 2014, the District's board of directors (Board) created a Solar

---

3       In December 2015, at the time the District first claimed an exemption for the Solar Project, the HMC contained 17 separate titles. (<https://library.municode.com/ca/hesperia/codes/code_of_ordinances/237774?nodeId=S UHITA> [as of July 19, 2019].)  Section 16.16.063 was entitled "Alternative energy technology standards" and was found at title 16 ("Development Code"), chapter 16.16 ("Land Use Designations"), article III. ("Additional Uses"). (<https://library.municode.com/ca/hesperia/codes/code_of_ordinances/237774?nodeId=T IT16DECO_CH16.16LAUSDE_ARTIIIADUS_16.16.063ALENTEST> [as of July 19, 2019].)  HMC section 16.16.063 reads the same today (<https://library.municode.com/ca/hesperia/codes/code_of_ordinances?nodeId=TIT16DE CO_CH16.16LAUSDE_ARTIIIADUS_16.16.063ALENTEST> [as of July 19, 2019]) and has not changed since June 2012 (Ord. No. 2009-12, § 3, 2-16-10; Ord. No. 2011-08, § 3 (Exh. A), 8-2-11; Ord. No. 2012-07, § 3 (Exh. A), 6-19-12).

Power Alternatives Ad Hoc Committee which then considered presentations from three solar power vendors for the Solar Project.

By late May of 2015, the City provided the District with comments to an Initial Study and Mitigated Negative Declaration for the Solar Project (initial mitigated negative declaration) that the District prepared and circulated pursuant to the California Environmental Quality Act (CEQA). According to the City, the Solar Project was "a 0.96 megawatt solar facility on five to six acres within the City" with "a total of 2,160 solar panels" on a site that "will continue to be used for growing forage crops and disposal of treated effluent that is generate by wastewater treatment plants in Lake Arrowhead." More specifically, the City commented that the initial mitigated negative declaration *both* "requires a general plan amendment and zone change to be [filed] with the City" *and* "does not address how the project will avoid being within 660 feet from the property to the south, which is agriculturally designated," in violation of HMC section 16.16.063(B) (which precludes solar farms within 660 feet of agriculturally designated property).

In August 2015, the District entered into a generator interconnection agreement with Southern California Edison Company (Edison), whereby the District's Solar Project would produce electricity for use by Edison through Edison's electrical grid distribution system in exchange for bill credits that Edison would apply to the District's ongoing

obligations to Edison for energy use at any location in the District.[4]  To this end, in October 2015, the Board passed a resolution that authorized and approved the award of an energy services agreement to SunPower Corporation, Systems (SunPower), subject to conditions not relevant to this appeal.[5]  Pursuant to this resolution, in November 2015, the District and SunPower entered into a formal "Engineering, Procurement and Construction Agreement," according to which SunPower agreed to design, engineer, construct, and install a 939.6 kW-dc single-axis tracking solar photovoltaic generation system at the Project Site.

Following consideration of the comments from the City (described *ante*) and others in response to the May 2015 initial mitigated negative declaration, the District gave notice of "a public hearing at which the Board may make findings pursuant to Section 53096 of the Government Code that there is no feasible alternative to the proposed location of the solar project at the Hesperia Farm Solar Photovoltaic Project

---

[4]    Public Utilities Code section 2830 authorizes a local government renewable energy self-generation bill credit transfer program (RES-BCT Program).  Such a program allows a special district, like the District here, to use and develop raw land for facilities for the generation of energy and then, based on the energy created by those facilities, apply for a bill credit to any districtwide location.  (*Ibid.*)

[5]    The District took its action pursuant to section 4217.10 et seq., which provides in part that "public agencies may develop energy conservation, cogeneration, and alternate energy supply sources at the facilities of public agencies in accordance with this chapter." (§ 4217.10.)  In this context, an energy services agreement "means a contract entered into by a public agency with any person, pursuant to which the person will provide electrical . . . energy . . . to a public agency from an energy conservation facility"; and an energy conservation facility "means alternate energy equipment, cogeneration equipment, or conservation measures located . . . on land owned by public agencies."  (§ 4217.11, subds. (f), (e).)

Site and that, by four-fifths vote of the Board, the City of Hesperia's zoning ordinance is, therefore, rendered inapplicable."[6] The City responded to the notice, repeating its original objections—namely, that the Solar Project required an amendment to the City's general plan and a change in location to avoid a violation of HMC § 16.16.063(B)—and setting forth its position in opposition to the District's potential actions to render the City's local land use regulations inapplicable to the Solar Project.

At the District's December 15, 2015 meeting, the Board adopted resolution No. 2015-14, which rendered the City's zoning ordinances inapplicable to the District's Solar Project. In part, this resolution provides as follows:

> "2. The Board finds and determines that the [Solar] Project constitutes facilities for the generation of electrical energy, and therefore meets the criteria for exemption from . . . City of Hesperia zoning ordinances under Government Code section 53091, subdivision (e).

> "3. The Board finds and determines that for over a year the District's Solar Power Alternatives Ad Hoc Committee and SunPower met on numerous occasions and, with District staff, thoroughly reviewed and analyzed all potential locations for the [Solar] Project. The District does not own any other property that has the acreage and necessary components for a successful solar project due to terrain, trees, and weather conditions. Further, in order to comply with the City's solar ordinance, the District would have to redesign and relocate the Project away from the nearest residentially designated property, which would include the installation of additional AC conductor between the solar array and the Point of Interconnection [with Edison's grid]. This would result in a significant cost increase, measurable power loss, and project delay.

---

6    The District also revised the initial mitigated negative declaration in ways not significant to this appeal and gave notice that, at the same hearing, the Board would be considering the revised declaration and approval of the Solar Project under CEQA.

8

"4. Thus, the Board finds it is not feasible to install the solar photovoltaic system at any other locations other than the [Project Site].

"5. Based on the above-findings, the Board finds and determines that pursuant to Government Code section 53096, there is no feasible alternative to the location of the [Solar] Project at the Hesperia Farms site, by four-fifths vote of the Board, City of Hesperia zoning ordinances, including but not limited to, City of Hesperia Ordinance No. 2012-07[7], are rendered inapplicable to the Project. (*Sic.*)"

The District gave, and on December 18, 2015, the City received, notice of the Board's December 15 action, including a copy of resolution No. 2015-14.

C.     *The Litigation*

In February 2016, the City filed the underlying action—i.e., a petition and complaint—seeking a writ of mandate and declaratory and injunctive relief. The City named as respondents/defendants the District and the Board and named as real parties in interest SunPower, Edison, and a third party with which the District had contracted related to the Solar Project. The District, the Board, and SunPower filed answers to the petition/complaint. Edison and the third party filed disclaimers of interest in the dispute, and the City dismissed the action without prejudice as to these two real parties in interest.

All three causes of action are based on the City's contentions that the Solar Project is beyond the scope of the District's authority and that the siting, development, and construction of the solar farm are subject to the City's zoning ordinances. In the first cause of action, the City alleged that the District lacked the authority to undertake the

---

7     City of Hesperia Ordinance No. 2012-07 contains the most recent amendments to HMC section 16.16.063. (See fn. 3, *ante*.)

9

Solar Project, because the District was only authorized to provide water and wastewater treatment service, yet the anticipated services associated with the Solar Project involved the provision of electricity. In the second cause of action, the City alleged that the District was not exempt from the City's zoning ordinances. In the third cause of action, the City sought declarations, consistent with the first two causes of action, that the Solar Project was both beyond the scope of the District's authority and subject to the City's zoning regulations.

The trial court conducted proceedings in mandate on the first two causes of action. (Code Civ. Proc., § 1084 et seq.) Following an opening brief by the City, the District filed an opposition (in which SunPower joined), and the City filed a reply to the opposition. Counsel for the parties presented oral argument, after which the court took the matter under submission, ultimately issuing a written ruling in October 2016.

Deciding that the District has authority under the RES-BCT Program (Pub. Util. Code, § 2830) to produce electricity for Edison, the trial court denied the writ of mandate under the first cause of action.

The trial court granted the City's requested relief as to the second cause of action, issuing the writ of mandate, on the following grounds: The exceptions found at sections 53091(e) and 53096(a)—which, if applicable, would exempt the Solar Project from the City's zoning ordinances—do not apply to the Solar Project; and the administrative record does not contain substantial evidence to support the District's finding that there is no feasible alternative to installing the solar farm at any location other than the Project Site.

10

At the City's request, the trial court dismissed the third cause of action for declaratory relief.

In December 2016, the court entered judgment consistent with its October 2016 written ruling; and in February 2017, the court entered the same judgment with a copy of the written ruling, nunc pro tunc to the December 2016 date (Judgment).[8] In summary, the Judgment ordered in part as follows: The requested relief in the first cause of action (based on whether the District has the authority to produce electricity) is denied; the requested relief in the second cause of action (based on whether the District must comply with the City's zoning ordinances) is granted; and a writ of mandate shall issue, requiring the District and the Board either to comply with the City's zoning ordinances prior to implementing the Solar Project or, alternatively, to forego the project.[9]

The District timely appealed from the Judgment.

---

[8] The Judgment, which indicates that it is "NUNC PRO TUNC" does not state the nunc pro tunc date. Since the February 2017 document is identical in all respects to the December 2016 document, except that the later document contains the referenced "Exhibit A," we have assumed that the court intended the February 2017 filing to relate back to December 2016 date.

[9] "If the court determines that the action was not supported by substantial evidence, it shall declare it to be of no force and effect, and the zoning ordinance in question shall be applicable to the use of the property by the local agency." (§ 53096, subd. (b).)
Consistent with the Judgment, the clerk of the court issued a writ of mandate; and in response, the District and the Board filed a return.
The Judgment does not mention SunPower, other than to identify it as a party that appeared and was represented during the proceedings in mandate. Since SunPower has not participated in the appeal, we have no reason to consider whether the City's action remains pending against it.

## II. DISCUSSION

On appeal the District challenges the rulings of the trial court on the second cause of action in which the court granted a writ of mandate, ruling in part that the District's Solar Project was not exempt from the City's zoning ordinances. According to the District, the trial court erred by incorrectly interpreting, and thus in failing to apply, both the absolute exemption in section 53091(e) and the qualified exemption in section 53096(a). We disagree. As we explain, because the District's Solar Project includes the transmission of electrical energy, the exemption contained in section 53091(e) does not apply to the project; and because the administrative record does not contain substantial evidence to support the Board's finding that there is no feasible alternative location for the Project Site, the exemption contained in section 53096(a) does not apply to the project.

A.    *Standards of Review*

In the second cause of action, the City sought both ordinary mandamus (Code Civ. Proc., § 1085) and administrative mandamus (Code Civ. Proc., § 1094.5) relief. "Traditional mandate [under Code of Civil Procedure section 1085] lies to challenge an agency's failure to perform an act required by law"; whereas "[a]dministrative mandate [under Code of Civil Procedure section 1094.5] applies to challenge the results of an administrative hearing."[10]  (*Danser v. Public Employees' Retirement System* (2015) 240

10    As to traditional or ordinary mandamus: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station,

Cal.App.4th 885, 890.) "It is not inconsistent to award relief under both sections 1094.5 and 1085 of the Code of Civil Procedure." (*Conlan v. Bonta* (2002) 102 Cal.App.4th 745, 752.)

With regard to ordinary mandamus (Code Civ. Proc., § 1085), the City alleged in the second cause of action: "The District has a plain, clear and ministerial duty to comply with the City's zoning ordinances and its failure to comply with the City's zoning ordinances is arbitrary and capricious. The City has no plain, speedy and adequate legal remedy. Therefore, the City is entitled to a writ of mandate compelling the District to comply with City's zoning ordinances." With regard to administrative mandamus (Code Civ. Proc., § 1094.5), the City alleged in the second cause of action: "The absence of substantial evidence to support the District's findings of infeasibility [under section 53096(a)] renders its findings arbitrary and capricious." Throughout the proceedings, the parties and the trial court have, often without explanation, conflated concepts associated with ordinary mandamus and administrative mandamus.[11] Under

---

or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person." (Code Civ. Proc., § 1085, subd. (a).)

As to administrative mandamus: "[T]he writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal[.]" (Code Civ. Proc., § 1094.5, subd. (a).)

11      For example, the trial court reviewed the District's administrative decision under Code of Civil Procedure section 1094.5 without mentioning Code of Civil Procedure section 1085; the Judgment does not identify the type of mandamus relief the court awarded, although the Judgment incorporates the court's written ruling based on section 1094.5; neither the Judgment nor the writ cites a statute, but both direct that, with

13

these circumstances, we will not rely on the labels presented or the statutes cited; instead, we have considered the substance of the City's challenge to the District's action and the trial court's handling of the specific challenge. (See *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 769, fn. 5 ["where the entitlement to mandate relief has been adequately pled, 'a trial court may treat a proceeding brought under Code of Civil Procedure section 1085 as one brought under Code of Civil Procedure section 1094.5' "].)

Accordingly, on the record before us, given the issues, the briefing, and the trial court's ruling—and, in particular, the City's challenge to the District's resolution No. 2015-14, in which the Board, in an exercise of its discretion, determined that there was no feasible alternative to installing the solar farm at any location other than the Project Site—we will proceed under administrative mandamus, Code of Civil Procedure section 1094.5.

On review of an administrative mandamus judgment, the inquiry is "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) For purposes of this analysis in the present appeal, an abuse of discretion is established "if the [agency] has not proceeded in the manner required by law" (Code Civ. Proc., § 1094.5, subd. (b)) or "if the court determines that the findings are not supported by substantial

_____

regard to the proposed Solar Project, the District either comply with the City's zoning ordinances or not proceed with the project; in its appellate briefing, although the District does not cite either statute, it relies on caselaw involving administrative mandamus relief (Code Civ. Proc., § 1094.5), including the standard of review; in its appellate briefing, the City argues for review under the standard applied to ordinary mandamus, citing only section 1085.

14

evidence in the light of the whole record" (Code Civ. Proc., § 1094.5, subd. (c)).[12] " ' "In [administrative] mandamus actions, the trial court and appellate court perform the same function" ' "; "we do not 'undertak[e] a review of the trial court's findings or conclusions. Instead, "we review the matter without reference to the trial court's actions." ' " (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1197 (*Jefferson Street Ventures*).)  Appellate review of the agency's factual determinations in administrative mandamus proceedings is "deferential," and "the agency's findings must be upheld unless arbitrary, capricious, or entirely lacking evidentiary support."  (*State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 977.)

" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the

---

[12]    In cases not like the present one, where the administrative decision involves " 'a fundamental vested right,' " a challenge to the substantiality of the evidence in support of the administrative mandamus findings requires " 'an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings. ' "  (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 926.)  Here, neither of the parties suggests, nor does the record contain a basis on which to conclude, that the District's determinations involved a fundamental vested right.  (*PMI Mortgage Ins. Co. v. City of Pacific Grove* (1981) 128 Cal.App.3d 724, 729 ["Cases involving abuse of discretion charges in the area of land use regulation do not involve fundamental vested rights."].)

15

statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " ' " (*Meza v. Portfolio Recovery Associates, LLC* (2019) 6 Cal.5th 844, 856 (*Meza*).)  In construing a statute, the court is required "to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."  (Code Civ. Proc., § 1858.)  For these reasons, appellate review of the trial court's interpretation of a statute is de novo.  (*Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 639 (*Flethez*) [administrative mandamus proceedings].)

B.    *Section 53091(e) Does Not Provide an Exemption From the City's Zoning Ordinances for the Solar Project*

As we introduced *ante*, section 53091 begins with the presumption that, for purposes of the Solar Project, the District must comply with the City's zoning ordinances. (§ 53091, subd. (a).)  The District contends that, because the absolute exemption contained in section 53091(e) applies to the Solar Project, the project is statutorily exempt from the City's local land use regulations.  The City responds by arguing that, because the exception to the absolute exemption contained in section 53091(e) applies to the Solar Project, the exemption does not apply, and the District must comply with the City's zoning ordinances.

"Because statutory language is generally the most reliable indicator of legislative intent, we start with the language of [the statute to be construed]."  (*Flethez, supra*, 2

16

Cal.5th at p. 640; accord, *Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490 ["the statutory language is generally the most reliable indicator of legislative intent"].)  Section 53091 contains in part the following language:

> "(a)  Each local agency shall comply with all applicable . . . zoning ordinances of the . . . city in which the territory of the local agency is situated.  [¶] . . . [¶]
>
> "(e)  Zoning ordinances of a . . . city shall not apply to the location or construction of facilities . . . for the production or generation of electrical energy . . . .  Zoning ordinances of a . . . city shall apply to the location or construction of facilities for the storage or transmission of electrical energy by a local agency, if the zoning ordinances make provision for those facilities."[13]

Thus, under section 53091, subdivision (a) provides *the rule*, and subdivision (e) provides both *an exemption* to the rule (on which the District relies) and *an exception* to the exemption to the rule (on which the City relies).  The *rule* is that the District, as a local agency, "shall comply with all applicable . . . zoning ordinances" of the City (§ 53091, subd. (a)); the *exemption* is that the City's zoning ordinances do not apply "to the location or construction of facilities . . . for the production or generation of electrical energy" (§ 53091(e)); and the *exception* to the exemption—i.e., resulting in an application of the rule—is that the City's land use regulations will apply to the proposed

_____

[13]     " 'Local agency' means an agency of the state for the local performance of governmental or proprietary function within limited boundaries" and "does not include the state, a city, a county, a rapid transit district, or a [specific type of] rail transit district[.]"  (§ 53090, subd. (a).)  The parties agree that, for purposes of analyzing and ultimately applying section 53091(e), the District is a "local agency."

The parties also agree that the City's zoning ordinances "make provision for those facilities" proposed by the District's Solar Project, as required by section 53091(e).  At a minimum, the District's Solar Project qualifies as a "solar farm" for purposes of HMC section 16.16.063(B), quoted in part in the text at part I.A., *ante*.

facilities if they are "for the storage or transmission of electrical energy by a local agency, if the [City's] zoning ordinances make provision for those facilities." (§ 53091(e).)

We proceed, "in accordance with interpretive guidelines," with the understanding that statutory exemptions, like the first sentence of section 53091(e), must be "narrowly construed." (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1018, fn. 12 (*Lafayette*) [§ 53091(e)]; accord, *National City v. Fritz* (1949) 33 Cal.2d 635, 636 [statutory exemptions "are to be strictly construed"].) Because the second sentence of section 53091(e) is an exception to the exemption—i.e., it requires application of the rule in subdivision (a)—no such limitation is placed on our construction of the language.

Section 53091 was first enacted in 1959 and has been amended five times, the most recently in 2002. (Stats. 1959, ch. 2110, § 1, pp. 4907-4908; Stats. 1977, ch. 435, § 1, pp. 1467-1468; Stats. 1984, ch. 976, § 1, pp. 3386-3387; Stats. 1997, ch. 580, § 2, pp. 3554-3555; Stats. 2001, ch. 396, § 1, pp. 3661-3662; Stats. 2002, ch. 267, § 1, pp. 1111-1112.) To assist us in determining the Legislature's intent in enacting the current version of section 53091, we will summarize the development of the relevant language during these 60 years.

The first sentence of section 53091, which now is found in a separate subdivision (§ 53091, subd. (a)), has not changed. Thus, the starting point for the Legislature's attempt to deal with the tension between local governments' control over land use regulation and the state's interest in encouraging local agencies' development of electrical

18

energy has consistently required such agencies to "comply with all applicable . . . zoning ordinances of the county or city in which the territory of the local agency is situated." (Stats. 1959, ch. 2110, § 1, p. 4907; Stats. 1977, ch. 435, § 1, p. 1467; Stats. 1984, ch. 976, § 1, p. 3386; Stats. 1997, ch. 580, § 2, p. 3554; Stats. 2001, ch. 396, § 1, p. 3661; Stats. 2002, ch. 267, § 1, p. 1111 (§ 53091, subd. (a)).)

The Legislature's approach to a local agency's choices related to the location or construction of facilities for the production, generation, storage, or production of electrical energy, however, has changed over the years. In 1959, no local land use regulations applied; the agencies could locate and construct such facilities as desired under original section 53091. (Stats. 1959, ch. 2110, § 1, p. 4908.) In 1977, the Legislature amended the statute to provide an exemption and an exception to the exemption for specified projects. As relevant here, the 1977 amendments created an exemption from local zoning ordinances for the location and construction by local agencies of facilities related to "the production or generation of electrical energy"—unless the facilities were for "the storage or transmission of electrical energy," in which event the agencies were required to comply with the local land use regulations. (Stats. 1977, ch. 435, § 1, p. 1468; Stats. 1984, ch. 976, § 1, p. 3387; Stats. 1997, ch. 580, § 2, p. 3555; Stats. 2001, ch. 396, § 1, p. 3662; Stats. 2002, ch. 267, § 1, p. 1112 (§ 53091(e)).)

At all times since its enactment in 1959, section 53091 has also applied to local agencies' location or construction of facilities for the production, generation, storage, or transmission of *water*. (Stats. 1959, ch. 2110, § 1, p. 4908; Stats. 1977, ch. 435, § 1,

19

p. 1468; Stats. 1984, ch. 976, § 1, p. 3387; Stats. 1997, ch. 580, § 2, p. 3555; Stats. 2001, ch. 396, § 1, p. 3662; Stats. 2002, ch. 267, § 1, p. 1111 (§ 53091).)  Indeed, with one exception, the statute treated local agencies' projects for the development of electrical energy and of water the same insofar as exempting their proposed facilities from local land use regulations.[14]  (Stats. 1959, ch. 2110, § 1, p. 4908; Stats. 1977, ch. 435, § 1, p. 1468; Stats. 1984, ch. 976, § 1, p. 3387; Stats. 1997, ch. 580, § 2, p. 3555; Stats. 2001, ch. 396, § 1, p. 3662; Stats. 2002, ch. 267, § 1, pp. 1111-1112 (§ 53091(e)).)

In this latter context (i.e. water facilities), we have the benefit and guidance of established precedent, which has not been questioned or challenged for more than a quarter of a century, that sets forth the Legislature's intent in enacting section 53091:

> "Section 53091 is part of a statutory scheme—'Regulation of Local Agencies by Counties and Cities,' sections 53090 through 53095 (Stats. 1959, ch. 2110, § 1, pp. 4907-4909)—enacted in response to opinions[15] which broadly immunized all state agencies from local regulatory control.  [Citations.]  Section 53091 evinces a legislative intent to vest in cities and counties control over zoning and building restrictions, thereby strengthening local planning authority. . . .  [¶] . . . When read as a statutory scheme, the obvious intent of the Legislature was to strike a balance between the value of local zoning

---

14     The exception is that, with regard to water facilities, storage and transmission are not treated differently than production and generation.  For water facilities, *all* development phases are exempt from the application of local zoning.  (Stats. 1959, ch. 2110, § 1, p. 4908; Stats. 1977, ch. 435, § 1, p. 1468; Stats. 1984, ch. 976, § 1, p. 3387; Stats. 1997, ch. 580, § 2, p. 3555; Stats. 2001, ch. 267, § 1, p. 3662; Stats. 2002, ch. 267, § 1, pp. 1111-1112 (§ 53091(e) ["Zoning ordinances of a county or city shall not apply to the location or construction of facilities for the production, generation, storage, treatment, or transmission of water"]).)

15     In a footnote at this point, the *Lafayette* opinion cites *Hall v. City of Taft* (1956) 47 Cal.2d 177 and *Town of Atherton v. Superior Court* (1958) 159 Cal.App.2d 417.

control by cities and counties and the state interest in efficient storage and transmission of water. [Citations.] [¶] . . . [¶] . . . The primary objective of the statutory scheme is to maintain local control of land use decisions (§ 53091), with carefully specified exceptions where necessary to further countervailing interests." (*Lafayette*, *supra*, 16 Cal.App.4th at pp. 1013, fn. omitted, 1014, 1017.)

We agree with the *Lafayette* court's description of the legislative intent in enacting section 53091 for the location or construction of facilities for the production, generation, storage, or transmission of *water* and conclude that the intent is the same where, as here, the proposed facilities are for the production or generation of *electrical energy*. For our purposes, therefore, in enacting the current version of section 53091, the Legislature intended "to vest in cities and counties control over zoning and building restrictions, thereby strengthening local planning authority" in order "to strike a balance between the value of local zoning control by cities and counties and the state interest" in the location and construction of facilities for the production, generation, storage, and transmission of electrical energy. (See *Lafayette*, *supra*, 16 Cal.App.4th at pp. 1013, 1014.) In short, for the development of electrical energy by local agencies, the legislative intent is "to maintain local control of land use decisions . . . with carefully specified exceptions where necessary to further countervailing interests." (*Id.* at p. 1017.)

Having considered and determined the Legislative intent in enacting and amending section 53091(e), we now turn to its application in the present case.

On two grounds, the trial court ruled that the District's Solar Project was not exempt from the City's zoning ordinances. First, the court declined to apply section 53091(e)'s exemption because the Solar Project was merely "incidental"—i.e., the

21

proposed facilities were not "integral" or "directly and immediately" related—to the District's *authorized services* to provide water and wastewater treatment. Second, the court concluded that, since a principal purpose of the facilities to be developed was to *export* electrical energy to Edison's electrical grid distribution system under the RES-BCT program, the facilities necessarily included the *transmission* of electrical energy—to which the City's zoning ordinances applied, as an exception to the exemption under section 53091(e).

On appeal, the District initially argues that the nature of its authorized services is irrelevant to a determination of the potential application of section 53091(e)'s absolute exemption. The District next argues that, in determining the legislative intent, we should apply the "plain meaning" to the words in the exemption, but not to the words in the exception to the exemption; for those words, the District argues, the trial court erred in applying a "literal interpretation."

In its brief on appeal, the City fully supports the trial court's rulings. First the City contends that, because the Solar Project is not integral to the District's authorized operations, the absolute exemption in section 53091(e) does not apply. Next, the City argues that an application of the " 'usual and ordinary meaning' " or " 'plain meaning' " of the words in the exception to the absolute exclusion leads to the conclusion that the Solar Project involves the "transmission of electrical energy by a local agency," therefore requiring the District to comply with the City's land use regulations.

As we explain, we disagree with the court's first ruling, but agree with the second; and since the exception to exemption applies, the trial court properly concluded that

22

section 53091(e) did not excuse (i.e., exempt) the District from complying with the City's zoning ordinances prior to proceeding with the Solar Project.

1.  *The Exemption in the First Sentence of Section 53091(e)*

On appeal, the District persuasively argues that an application of the plain meaning of the words in *the first sentence* of section 53091(e) results in an exemption from the City's zoning ordinances for the District's Solar Project. As applicable to the project, the first sentence provides: "Zoning ordinances of a county or city shall not apply to the location or construction of facilities . . . for the production or generation of electrical energy." (§ 53091(e).) There is no question—indeed, the City does not challenge—that the Solar Project involves "the location or construction of facilities . . . for the production or generation of electrical energy." Thus, as directed by our Supreme Court under *Meza*, *supra*, 6 Cal.5th at page 856, we will give this statutory language "a plain and commonsense meaning" and follow this meaning, since there is no suggestion that "a literal interpretation would result in absurd consequences the Legislature did not intend".

We disagree with the City's argument that, because "the [Solar P]roject is not integral to the District's authorized operations," section 53091(e) does not apply to the project. (Some initial capitalization omitted.) In support of its position, which is consistent with the trial court's ruling, the City relies on *Lafayette*, *supra*, 16 Cal.App.4th 1005. In *Lafayette*, the defendant water district proposed to expand and improve support facilities at a water filtration plant that treated raw water for delivery to the district's customers. (*Id.* at p. 1010.) After the plaintiff City of Lafayette denied the district's

application for a use permit for the project, the district declared its project exempt from the city's zoning and building ordinances under then-applicable former sections 53091 (Stats. 1984, ch. 976, § 1, pp. 3386-3387) and 53096 (Stats. 1977, ch. 435, § 2, p. 1468). (*Lafayette*, at pp. 1010-1011.) Like the present case, the city then sued the district, alleging claims for a writ of administrative mandamus and for injunctive and declaratory relief. (*Id.* at p. 1011.) Also like the present case, the issue in *Lafayette* was whether the district's proposed project was exempt from the city's land use regulations. (*Id.* at p. 1012.)

The *Lafayette* court declined to apply former section 53091's exemption to the district's proposed project. The court first concluded that, because the project was for the construction of "a support facility[,] it does not actually perform the function of generating, transmitting or storing water"—a requirement for the absolute exemption in former section 53091. (*Lafayette*, *supra*, 16 Cal.App.4th at p. 1014.) Rather, the *Lafayette* court contrasted, the water district's project "is a facility for the storage of materials and equipment necessary for maintenance and repair of aqueducts, pipelines, [filter] plants and reservoirs"—which is not mentioned in former section 53091. (*Lafayette*, at p. 1014.) The court then held that, since "the absolute exemption of section 53091 was intended to be limited to facilities *directly and immediately* used to produce, generate, store or transmit water," the exemption did not apply to the district's project. (*Lafayette*, at p. 1014.)

According to the City, *Lafayette* limits the application of the absolute exemption in section 53091(e) to agencies "whose *purpose* is providing water or electricity" and

24

whose projects involve "siting facilities necessary and indispensable to their authorized functions."  In arguing that section 53091(e) does not apply to the Solar Project because "the project is not integral to the District's authorized operations" (some initial capitalization omitted), the City focuses on the following facts:  The District's purpose is to provide water and wastewater treatment services, yet the Solar Project will neither provide such services nor provide electrical energy that will be used directly in providing such services since the power will be uploaded to Edison's electrical grid.  We disagree with the City's suggested application of *Lafayette* to the present case.

In *Lafayette*, the court ruled only that the exemption provided at former section 53091 did not apply because, as potentially applicable in that case, *the exemption itself* is limited to "the location or construction of facilities *for the production, generation, storage, or transmission of water*[.]"  (Former § 53091, italics added; Stats. 1984, ch. 976, § 1, p. 3387; italics added.)  That is to say, the limitation to the application of section 53091 in *Lafayette* is based on the purpose of *the proposed facilities*,[16] not (as argued by the City) on the purpose of *the agency developing the proposed facilities*.  In not applying *Lafayette* in the present case, we do not disagree with it, only with what the City contends it holds.

---

[16]    Like current section 53091(e), at the time of the *Lafayette* opinion in 1993, the absolute exemption in former section 53091 also applied to "the location or construction of facilities . . . *for the production or generation of electrical energy*[.]"  (Former § 53091, italics added; Stats. 1984, ch. 976, § 1, p. 3387.)

2.      *The Exception to the Exemption in the Second Sentence of Section 53091(e)*

Having concluded that the plain and commonsense meaning of the first sentence of section 53091(e) would allow an exemption from the City's zoning ordinances for the Solar Project, we next consider whether the exception to the exemption applies. In this regard, the subdivision's remaining sentence provides: "Zoning ordinances of a county or city shall apply to the location or construction of facilities for the storage or transmission of electrical energy by a local agency, if the zoning ordinances make provision for those facilities." (§ 53091(e).) Under this exception, therefore, even where an agency's project is exempt from local zoning (under the first sentence), if the project involves "facilities for the storage or transmission of electrical energy," then the exemption is inapplicable (under the second sentence), and the agency must comply with local zoning ordinances that provide for such facilities.

As we explain, we agree with the trial court's ruling that, because the Solar Project includes the "transmission of electrical energy," the City's zoning ordinances—which provide for such facilities (see fn. 13 and related text, *ante*)—apply to the Solar Project under section 53091(e).[17]

Focusing on the plain language of the statute, the trial court considered the facilities envisioned in the Solar Project in the context of a dictionary definition of "transmission" and concluded that the project involved the transmission of electrical energy by a local agency:

---

[17]     There is no argument on appeal that the Solar Project involved facilities for *the storage*, as opposed to *the transmission*, of electrical energy.

26

" 'Transmission' is defined as 'an act, process, or instance of transmitting' and 'something that is transmitted.' Transmit means 'to send or convey from one person or place to another.' (Merriam-Webster's Collegiate Dictionary (11th ed. 2004) p. 1329.)

"When the [Solar] Project and its purpose are considered, the [Solar] Project involves the transmission of electrical energy by a local agency, because *its purpose is to transmit electricity to Edison* under its RES-BCT Program. *The District will generate electricity and transfer it to Edison* in order to obtain credits to offset the District's energy consumption by other District facilities." (Italics added.)

Reasoning that the Solar Project involved the transmission of electrical energy, the trial court concluded that the exception to the exemption applied—and correspondingly ruled that the absolute exemption in section 53091(e) did not apply.

In our de novo review, we agree that the Solar Project involves the "transmission" of electrical energy. In particular, we are persuaded by language in the August 2015 generator interconnection agreement between the District and Edison, pursuant to which the parties agreed that District's energy generating facility would "interconnect with, and operate in parallel with," Edison's electrical grid distribution system.

The agreement expressly provides that "the basis for the Parties entering into this Agreement is that [the District] will *export electrical energy* to the grid" and that, after generating the electricity, the District will have the responsibility for "making all necessary arrangements (including scheduling) for *delivery of electricity*."[18] (Italics added.) In this context, the usual and customary meaning of the word "export" is "to

---

[18] Consistently, Edison's May 2015 System Impact Study on the Solar Project indicates that the power generated by the District "would be *delivered* to the [Edison] system at the [point of change of ownership]." (Italics added.)

27

carry away . . . to *transmit* or cause the spread of" (Webster's Third New Internat. Unabridged Dict. (2002) p. 802, col. 2, italics added) or "to send or *transmit* . . . to another place" (Random House Unabridged Dict. (2d ed. 1993) p. 682, col. 2, italics added); the usual and customary meaning of the word "delivery" is the "*transfer* of the body or substance of a thing" (Webster's, at p. 597, col. 3, italics added) or "a formal act performed to make a *transfer* of property legally effective" (Random House, at p. 528, col. 1, italics added); and, in both dictionaries, to "transfer" means to "transmit." (Webster's, at p. 2427, col. 1; Random House, at p. 2009, col. 3.)

On appeal, the District argues *against* using the plain meaning of the word "transmission," because, according to the District, such a definition "would prohibit any electrical energy facility from qualifying for the Absolute Exemption [under section 53091(e)], as there must always be some mechanism to convey the electrical energy produced or generated for use."

We are not troubled by the possibility that the absolute exception in section 53091(e) may never apply to the location or construction of electrical energy facilities. In the same legislation that first amended section 53091 to include the exception to the exemption, the Legislature also enacted section 53096(a), which provides a qualified exemption to a local government's land use regulations under certain conditions. (Stats. 1977, ch. 435, §§ 1 [§ 53091], 2 [§ 53096], pp. 1467-1469.) Indeed, in the newly enacted statute, the Legislature expressly dealt with providing an exemption, albeit qualified, for facilities related to the *transmission* of electrical energy: At that time, former section 53096(a) provided that, "[*n*]*otwithstanding* [*section 53091*]," a local

28

agency is authorized to render a city's or county's zoning ordinances inapplicable to any proposed use of its property—*including facilities related to the storage or transmission of electrical energy*—upon a vote of four-fifths of the members of the local agency that there is no feasible alternative to the proposed use by the agency. (Stats. 1977, ch. 435, § 2, p. 1468, italics added.[19]) Thus, even if—as the District posits without discussion—the absolute exception in section 53091(e) may never apply to the location or construction of facilities for the production or generation of electrical energy, the qualified exception in section 53096(a) is available if four-fifths of the agency's board determines there is no feasible alternative to the proposed use.

The District presents two arguments as to why it believes the dictionary definition—i.e., the usual and customary meaning—of "transmission" should not be applied in this case. Neither is persuasive.

First, the District relies on its understanding that, in the 1977 amendments to former section 53091, the Legislature removed the prior exemption from local zoning ordinances for facilities that store or transmit energy "in response to complaints over the placement of 'large transmission poles in residential neighborhoods' in 1976 by [one specifically identified utility district]."[20] Based on this understanding, the District

---

[19]    Current section 53096(a) is not substantively different. (Stats. 2002, ch. 267, § 2, pp. 1112-1113.) We discuss section 53096(a) in greater detail at part II.C., *post*.

[20]    The District relies on the Enrolled Bill Report of the Governor's Office of Planning and Research. An enrolled bill report " 'is prepared by a department or agency in the executive branch that would be affected by the legislation. Enrolled bill reports are typically forwarded to the Governor's office [after the Legislature has passed the

29

then argues that, by enacting the legislation that included the exception (for facilities that store or transmit electrical energy) to the exemption (for facilities that produce or generate electrical energy), the Legislature "*intended* to cover large transmission lines or poles transmitting energy to customers, not any form of transmitting electrical energy to the grid." (Italics added.) We disagree. The fact that a legislator's constituents may have complained about the placement of large transmission poles is not indication of a legislative intent to limit the application of the legislation to large poles. We do not infer legislative intent from a statement made by a non-legislator *after* passage of the legislation (see fn. 20, *ante*). (*Haworth v. Lira* (1991) 232 Cal.App.3d 1362, 1369 [post-enactment statement by a person who was not a member of the Legislature "is entitled to virtually no weight"].) In any event, the District's objection is not to the trial court's use of the plain meaning of the word "transmission"; the District's objection is that the trial court did not infer a legislative intent to limit the application of the plain meaning of the word to instances where the transmission was effected by large lines or poles. There is no basis on which to infer such an intent, since the Legislature could have included such limiting language if that was its intent.

Second, the District argues that its Solar Project does "not include a 'transmission' component as the energy generated by the Solar Project would flow through the meter at the interconnection facilities to the existing [Edison] distribution system under the

legislation and] before the Governor decides whether to sign the enrolled bill.' " (*In re Lucas* (2012) 53 Cal.4th 839, 856, fn. 13.) Based on its date and contents, this appears to be the case with the enrolled bill report on which the District relies; it was prepared by a staff member and signed by the deputy director of the Office of Planning and Research.

Interconnection Agreement and the RES-BCT Program."  The District relies on Public Utilities Code section 2830, which applies to RES-BCT programs like Edison's and provides at subdivision (b) that, for purposes of the interconnection agreement between Edison and the District, the District may only participate if nine specified conditions are met.  One of these requirements is that "[a]ll costs associated with interconnection are the responsibility of the [District]"; and "[f]or purposes of this paragraph, 'interconnection' has the same meaning as defined in [Public Utilities Code] Section 2803 . . . ."[21]  (Pub. Util. Code, § 2830, subd. (b)(6).)  As they apply to the Solar Project, however, Public Utilities Code sections 2830, subdivision (b)(6), and 2803 tell us only that: "Interconnection" means the facilities necessary to connect the District's facilities for producing or generating energy with "the existing transmission facilities" of Edison; and the District is responsible for the costs associated with this interconnection.  *Edison's* "existing transmission facilities" are irrelevant to a consideration whether the Solar Project will involve *the District's* "transmission of electrical energy."  Stated more generally, those two statutes in the *Public Utilities Code*—and, in particular, their use of the word "interconnection"—do nothing to assist in providing either a definition of, or the legislative intent in using, the word "transmission" for purposes of applying *Government Code* section 53091(e)'s exception to the exemption to local zoning ordinances to

---

[21]    Public Utilities Code section 2803 provides in full:  " 'Interconnection' means the facilities necessary to physically connect the energy source of and the point of use by a private energy producer with the existing transmission facilities of a public utility, and shall include any necessary transformation, compression or other facilities necessary to make such interconnection effective."

31

facilities for the "transmission of electrical energy" in the production or generation of electrical energy. (See *Freitas v. County of Contra Costa* (1994) 28 Cal.App.4th 163, 172 [cannot rely on meaning of a word in one statutory scheme for purposes of determining the meaning of the same word in a different, even if related, statutory scheme—especially when found in different codes]; *Union Iron Works v. Industrial Accident Com. of California* (1922) 190 Cal. 33, 43 ["The fact that a word or phrase is common to both statutes will not suffice to make those decisions [under one statute] a controlling criterion for the construction of the statute before us."].)

Since the energy generated by the Solar Project would, according to the District, "flow through the meter at the interconnection facilities to the existing [Edison] distribution system," we have little difficulty concluding that this "flow" is a "transmission" under the plain meaning of the word "transmission." Moreover, since, as the District acknowledges, the Solar Project "requires the installation of approximately 250 feet of underground cable for interconnection to [Edison's] facilities," we also have little difficulty concluding that, because cable is necessary for "interconnection to [Edison's] facilities," the project involves the "transmission of electrical energy" for purposes of the exception to the exemption in section 53091(e).[22]

---

[22] We reject any suggestion that there is no transmission of electrical energy because, in the District's words, "*only . . .* approximately 250" feet of cable is required for interconnection. (Italics added.) Section 53091(e) does not contain any distance limitation, and the District does not explain why we should infer one.

In conclusion, the plain meaning of "transmission" is to send or export, and there is no basis on which to conclude that, in using the word "transmission" in section 53091(e), the Legislature meant anything else.

For the foregoing reasons, the District did not meet its burden of establishing that the trial court erred in ruling that, for purposes of the proposed Solar Project, section 53091(e) does not provide the District with an *absolute* exemption from complying with the City's zoning ordinances. We next consider whether, as the District also contends, section 53096(a) provides a *qualified* exemption for the Solar Project.

C.      *Section 53096(a) Does Not Provide an Exemption from the City's Zoning Ordinances for the Solar Project*

Even where a local agency is unable to take advantage of the absolute exemption in section 53091(e) from complying with local land use regulations, section 53096(a) provides a qualified exemption for a local agency's proposed use of property for facilities "related to" the storage or transmission of electrical energy:

> "Notwithstanding any other provision of this article, the governing board of a local agency, by vote of four-fifths of its members, may render a city or county zoning ordinance inapplicable to a proposed use of property if the local agency at a noticed public hearing determines by resolution that *there is no feasible alternative to its proposal.* The governing board may not render a zoning ordinance inapplicable to a proposed use of property when the proposed use of the property by the local agency is for facilities not related to storage or transmission of water or electrical energy, including, but not limited to, warehouses, administrative buildings or automotive storage and repair buildings." (§ 53096(a), italics added.)

"Parsing the double negative [in the second sentence], this says a local agency may render a zoning ordinance inapplicable to facilities '*related to*' the storage or transmission

33

of [electrical energy]" upon the requisite showing and approval by four-fifths of the agency's board. (*Delta Wetlands Properties v. County of San Joaquin* (2004) 121 Cal.App.4th 128, 140.) As defined for purposes of section 53096(a), "feasible" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 53096, subd. (c).)

Here, in compliance with section 53096(a)'s procedural requirements, the Board found and determined as follows in resolution No. 2015-14:

> "3. . . . The District does not own any other property that has the acreage and necessary components for a successful solar project due to terrain, trees, and weather conditions. Further, in order to comply with the City's solar ordinance, the District would have to redesign and relocate the Project away from the nearest residentially designated property, which would include the installation of additional AC conductor between the solar array and the Point of Interconnection [with Edison's grid]. This would result in a significant cost increase, measurable power loss, and project delay.

> "4. Thus, the Board finds it is not feasible to install the solar photovoltaic system at any other locations other than the [Project Site].

> "5. Based on the above-findings, the Board finds and determines that pursuant to Government Code section 53096, there is no feasible alternative to the location of the [Solar] Project at the Hesperia Farms site, by four-fifths vote of the Board, City of Hesperia zoning ordinances, including but not limited to, City of Hesperia Ordinance No. 2012-07, are rendered inapplicable to the Project. (*Sic*.)"

34

As we explain, we agree with the trial court's ruling that the administrative record does not contain substantial evidence to support the District's finding that there is no feasible alternative to installing the solar farm at any location other than the Project Site.[23]

As we introduced *ante*, however, because this is an appeal from the trial court's grant of an administrative writ of mandate under Code of Civil Procedure section 1094.5, "we do not 'undertak[e] a review of the trial court's findings or conclusions. Instead, "we review the matter without reference to the trial court's actions." ' " (*Jefferson Street Ventures*, *supra*, 236 Cal.App.4th at p. 1197.) That is because " '[o]ur function is identical to that of the trial court, as we too must determine whether substantial evidence supports the administrative decision.' " (*Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 521; accord, *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 [appellate court applies the same standard of review as trial court].) " 'The reviewing court, like the trial court, may not reweigh the evidence, and is "bound to consider the facts in the light most favorable to the Board, giving it every reasonable

_____

23    We note a discrepancy between what the statute requires for an application of the exemption and what the Board resolved. Whereas section 53096(a) requires a resolution that "there is no feasible alternative *to [the local agency's] proposal*," here the Board resolved that "there is no feasible alternative *to the location of the [Solar] Project*." (All italics added.) We requested and received supplemental briefing from the parties as to the potential effect of the difference between feasible alternatives to the proposal (here, the Solar Project) and feasible alternatives merely to the location of the proposed project (here, the Project Site). The District and the City agree that the difference is irrelevant for purposes of the appeal; i.e., the parties agree that the District's resolution No. 2015-14 complies with section 53096(a). Accordingly, without deciding whether the feasibility of *the local agency's proposal* includes more than *the location of the project*, we will assume that the Board's resolution here is statutorily compliant, and we will proceed with explaining how, in passing resolution No. 2015-14, the District prejudicially abused its discretion.

inference and resolving all conflicts in its favor." ' " (*Hoitt*, at p. 522; accord, *Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Com.* (2004) 121 Cal.App.4th 1578, 1583.)  There is a presumption that the agency's findings are supported by substantial evidence; and since the party challenging those findings has the burden of demonstrating otherwise, here the City must establish that the administrative record does not contain substantial evidence to support the Board's finding that there is no feasible alternative to the Project Site.  (*Schutte & Koerting, Inc. v. Regional Water Quality Control Bd.* (2007) 158 Cal.App.4th 1373, 1384.)

As difficult as it is to prove a negative—namely, that the record does not contain substantial evidence—the City succeeded here, by establishing that, because the administrative record does not contain any evidence of an alternative location for the Solar Project (or evidence that no alternative exists), the record necessarily does not contain any evidence of economic, environmental, social, or technological factors associated with an alternative location.  As we explain, by failing to base its exercise of discretion on consideration of *any alternative* location for the Solar Project, the Board's finding that "there is no feasible *alternative* to the location of the [Solar] Project at the Hesperia Farms site" is not supported by substantial evidence.  (Italics added.)  With that determinative finding unsupported by substantial evidence, the District's resolution to render the City's zoning ordinances inapplicable to the Solar Project is a prejudicial abuse of discretion for purposes of Code of Civil Procedure section 1094.5, subdivision (b).

Before deciding that the qualified exemption of section 53096(a) applies to a proposed project, the local agency must establish, inter alia, that "there is no feasible

36

alternative to its proposal." (§ 53096(a).) In the present case that means there is no alternative location for successfully accomplishing the Solar Project "within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 53096(c).) Although our research has not located authority that has applied section 53096(c)'s definition of "feasible" for purposes of section 53096(a)'s qualified exemption, we find guidance in CEQA's application of the identical definition in the Public Resources Code.[24]

Under CEQA, "the policy of the state [is] 'that public agencies should not approve projects as proposed if there are *feasible* alternatives or *feasible* mitigation measures available which would substantially lessen the significant environmental effects of such projects. . . .' ([Pub. Resources Code, ]§ 21002.)" (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 597, italics added.) "In furtherance of this policy, [Public Resources Code] section 21081, subdivision (a), 'contains a "substantive mandate" requiring public agencies to refrain from approving projects with significant

---

[24] CEQA contains a set of definitions to be applied throughout the statutory scheme. (Pub. Resources Code, § 21060 et seq.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.)

"We presume that the Legislature is aware of laws in existence when it enacts a statute." (*Meza*, *supra*, 6 Cal.5th at pp. 862-863.) In this regard, the Legislature enacted the definition of "feasible" under CEQA in 1976 (Pub. Resources Code, § 21061.1; Stats. 1976, ch. 1312, § 5.1, p. 5891); and, using the same language a year later in 1977, the Legislature enacted the definition of "feasible" under the qualified exemption to local zoning regulation (former § 53096(c); Stats. 1977, ch. 435, § 2, p. 1469). Thus, we presume the Legislature intended that "feasible" be applied the same for purposes of local land use regulations under both CEQA and the qualified exemption in section 53096(a).

environmental effects if "there are *feasible* alternatives or mitigation measures" that can substantially lessen or avoid those effects.' " (*Uphold Our Heritage*, at p. 597, italics added; see *Sustainability, Parks, Recycling & Wildlife Legal Defense Fund v. San Francisco Bay Conservation & Development Com.* (2014) 226 Cal.App.4th 905, 917, italics added ["Under CEQA, governments are to choose '*feasible*' alternatives"].)

In *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, for example, since the CEQA-required environment impact report for a proposed hotel development omitted consideration of whether there was a feasible alternative site, the agency's approval of the report was "a prejudicial abuse of discretion." (*Id.* at p. 1180.) The developer argued that, "because it owns the [proposed hotel] site and no other feasible site in the general area, it would be unreasonable to require consideration of another site as an alternative."[25] (*Id.* at p. 1179.) The Court of Appeal disagreed. Given the statutory definition of "feasible" and the developer's lack of evidence as to any other site, the court concluded that there was no substantial evidence to support the developer's statement in its environmental impact report that there were no feasible *alternative* locations: "Consideration of alternatives is required . . . . The range of alternatives is governed by the 'rule of reason,' which requires only an analysis of those alternatives necessary to permit a reasoned choice. An [environment impact report] need not consider

---

25      In this regard, the District relies on its finding, as part of resolution No. 2015-14 (in which it found no feasible alternative to the Project Site), "that it does not own any property, other than the Hesperia Farm Property, with the acreage and necessary components for a solar project due to terrain, trees, and weather conditions." We note that the District does not provide a record reference for substantial evidence in support of this finding/determination.

an alternative, the effect of which cannot be reasonably ascertained and the implementation of which is remote and speculative." (*Id.* at pp. 1177-1178.)

Likewise, here, any "rule of reason" *requires* consideration of alternatives. That is because, in addition to the proposal from SunPower to develop the Solar Project at the far southern end of the Hesperia Farms property, the Board also looked into and considered proposals from two other solar providers that would have placed the solar farm at an *alternative* location on the northern portion of the District's Hesperia Farms property. With this knowledge, the issue becomes, at a minimum, whether the administrative record contains substantial evidence to support the District's finding that the northern location was not a feasible alternative.[26]

The City argues that an *alternative* location must be considered before a finding can be made that "there is no feasible *alternative* to the location of the [Solar] Project at the Hesperia Farms site" for purposes of section 53096(a). (Italics added.) The District responds by telling us that the following two documents in the administrative record contain "substantial evidence supporting the District's determination that there was no feasible alternative to locating the Solar Project on the Hesperia Farms Property": (1) a September 2014 "Water Supply, Wastewater and Alternative Energy Supply Study" (Study) by the United States Department of the Interior Bureau of Reclamation; and

---

[26]     Consistent with *Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 197 Cal.App.3d 1167, we do not propose "an inflexible rule that the availability of other sites always must be considered or that it never need be considered. Situations differ; what is reasonable in one case may be unreasonable in another. It is necessary to examine the particular situation presented to determine whether the availability of other feasible sites must be considered." (*Id.* at p. 1179.)

39

(2) SunPower's June 2015 "Lake Arrowhead CSD Solar Project Proposal" (Proposal). As we explain, because neither document contains evidence of *alternatives* (or evidence that no alternative exists), neither document supports the District's statement.

First, the District directs our attention to one paragraph, entitled "Solar Power," of the Bureau of Reclamation's 748-page Study, where the Study cites "an [April 2012] evaluation of the Hesperia [Farms property]" by SunPower, a copy of which is included as an exhibit to the Study.[27] According to the Study, the SunPower evaluation "indicates that the District's [Hesperia Farms] property is a prime location for solar development." The Study also indicates that SunPower's evaluation "detailed" the "[c]apital costs, utility inflation, photovoltaic degradation, etc." associated with the Solar Project.

Second, the District relies on two sentences of SunPower's 65-page June 2014 Proposal, in which SunPower describes the Project Site "located within a solar region categorized as **'Excellent'** by the National Renewable Energy Laboratory" and "within the heart of the best solar in the United States."

At best, this evidence supports a finding that the Project Site is a good location for the Solar Project; however, that is not the finding at issue for purposes of section 53096(a). For section 53096(a)'s qualified exemption to apply, section 53096(c)'s definition of "feasible" requires the necessary finding to be there is no alternative to the agency's proposal that is "capable of being accomplished in a successful manner within a

---

[27]    The City contends that what the District describes as "an evaluation" by SunPower is "little more than an advertising brochure for SunPower's solar panels and lacks any specific analysis of the District's Hesperia Farms Property."

reasonable period of time"; and that necessary finding must be supported by substantial evidence of the "economic, environmental, social, and technological factors."  The above-described evidence cited to us by the District does not mention, let alone "tak[e] into account" the feasibility factors associated with any alternative location, as required by section 53096(c).[28]

In addition, the District directs our attention to another portion of the June 2014 Proposal, where, according to the District, "SunPower agreed to a performance guarantee, which is impacted by the location of the site."[29]  Initially, the Proposal is not an agreement, but rather, as its title suggests, a proposal.  In any event, the existence of a

---

[28]    Elsewhere in its briefing, the District refers us to evidence from June 2014 meeting of the District's Solar Power Alternatives Ad Hoc Committee.  The District relies on evidence from a solar vendor other than SunPower related to a potential location in the northern, rather than southern, portion of the Hesperia Farms property.  The District then tells us that it selected the southern, rather than the northern, portion of the property "because of" this evidence from the other solar provider.  However, this evidence is from the solar vendor's analysis and presentation that "the northern site would actually be better" and "we want to be as far north on the property as possible."  More significantly, at the December 2015 meeting during which the Board adopted resolution No. 2015-14, there is no indication of what the Board considered or did in the context of how, if at all, the *evidence* from the other solar vendor (or otherwise) supported a finding that there was no feasible alternative to the District's proposed Solar Project—i.e., no consideration of how, as required by section 53096, the Board took into account the four feasibility factors in determining that a development at any other alternative location was not "capable of being accomplished in a successful manner within a reasonable period of time."

[29]    The Proposal describes the performance guarantee as follows:  "SunPower offers a comprehensive, weather-adjusted energy guarantee, also referred to as 'Performance Guarantee' or 'PeGu'.  Under the PeGu, SunPower will reimburse the District during the year of underperformance at a rate largely equivalent to the expected avoided utility cost in that year.  [¶] . . . All factors within the PeGu are negotiable.  [¶] . . . [¶]  Longer terms and alternative coverage rates are available for District consideration."

41

performance guarantee from SunPower—even if we assume the guarantee is "impacted by the location of the site"—is not evidence that there is no other location (feasible or otherwise) for the development of a solar energy farm on the District's Hesperia Farms property. Without consideration of *any alternative location* and its economic, environmental, social, and technological factors (or evidence that no alternative exists), SunPower's proposal of a performance guarantee cannot substantiate a finding that there is *no feasible alternative* to the Project Site as required by section 53096(a).

Finally, in its reply brief on appeal, as additional support of its position that the Hesperia Farms property does not provide a feasible alternative location, the District asks this court to take judicial notice of four documents not included in either the administrative record or the register of actions. Two of the documents are dated in January 2018, and two are dated in March 2018—which is more than a year after the nunc pro tunc date for entry of the Judgment. The City opposes the District's request. As we explain, we deny the District's motion for judicial notice and disregard the related argument in the District's reply brief.

In general, the rules on judicial notice that apply in civil cases (see Evid. Code, §§ 450-460) apply in administrative mandamus proceedings. (Evid. Code, § 300; *Mack v. State Bd. of Education* (1964) 224 Cal.App.2d 370, 372-375 [trial court proceedings].) However, with narrow exceptions inapplicable here,[30] our inquiry under Code of Civil

---

[30] "Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f)

42

Procedure section 1094.5 is limited to the administrative record made before the agency. (*Paoli v. California Coastal Com.* (1986) 178 Cal.App.3d 544, 551; see *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.) This is consistent with the general rule that "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

D.     *Conclusion*

Under section 53091(e), for the Solar Project to be exempt from the City's zoning ordinances, the District was required to establish that "the location or construction of facilities" for its Solar Project *both* involved "the production or generation of electrical energy" *and* did not involve "the storage or transmission of electrical energy." Because the District's proposed facilities involved the transmission of electrical energy, the District did not meet its burden of establishing that the absolute exemption contained in section 53091(e) applied to the Solar Project.

Even where proposed facilities, like the District's Solar Project, "relate[] to" the transmission of electrical energy, section 53096(a) allows an exemption from local land use regulation upon a specified showing—which includes a resolution (by a vote of

---

remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." (Code Civ. Proc., § 1094.5, subd. (e).)

four-fifths of the local agency's members) "that there is no feasible alternative to [the agency's] proposal" in light of the four feasibility factors set forth in section 53096, subdivision (c). Although the Board resolved as statutorily required, the administrative record does not contain substantial evidence in support of the Board's finding that underlies the resolution—namely, that "there is no feasible alternative to the location of the [Solar] Project at the Hesperia Farms site." Without substantial evidence to support the key finding necessary for the Board's vote, the District's resolution to render the City's zoning ordinances inapplicable to the Solar Project is a prejudicial abuse of discretion and cannot stand.

On the present record, in order for the District to have properly determined that "there is no feasible alternative" to the proposed location of the Solar Project for purposes of section 53096(a), the District was required to have: (1) considered alternative locations; (2) taken into account economic, environment, social, and technological factors associated with both the Project Site and the alternative locations; and (3) determined—i.e., exercised discretion based on substantial evidence in the administrative record—that, at the alternative locations, the proposal was not capable of being accomplished in a successful manner within a reasonable period of time.

For the foregoing reasons, neither section 53091(e) nor section 53096(a) provides an exemption from the City's zoning ordinances for the Solar Project. Accordingly, the trial court did not err in setting aside the Board's determination that an exemption applied and in issuing the requested writ of mandate.

III.  DISPOSITION

The February 2017 Judgment is affirmed.  The City is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


IRION, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.

45